# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 23, 2010 Session

## STATE OF TENNESSEE V. PHILLIP SHERMAINE LILLARD

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-D-3151    Seth Norman, Judge**

---

**No. M2009-00547-CCA-R3-CD - Filed December 20, 2010**

---

Defendant, Phillip Shermaine Lillard, was convicted of first degree felony murder and received a life sentence. On appeal, he contends that the evidence is insufficient to support his conviction and that the trial court erred in not charging the jury concerning his prior criminal convictions. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

David A. Collins, Nashville, Tennessee, for the for the appellant, Phillip Shermaine Lillard.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

At trial, Mary Green testified that on August 5, 2003, she was living at 509 Mill Station Drive with her two sons: Christopher Crockett and the fifteen-year-old victim, Justin Green. Mr. Crockett's girlfriend, Arenthia Burkeen, and their two daughters ages seven and three also lived in the residence. Around 9:00 p.m. on August 5, Ms. Green was in bed when her dog began barking and growling. Her seven-year-old granddaughter was also in the room. Ms. Green opened the bedroom door and saw a man, later identified as Benjamin

Dickens, standing there with a gun pressed to Mr. Crockett's chest. Mr. Dickens then turned the gun on Ms. Green and threatened to kill the dog. Ms. Green pleaded with Mr. Dickens not to kill the dog, and she offered to put the dog up. As Mr. Crockett took the dog to the den, Ms. Green heard gunfire in another area of the house.

Mr. Dickens ran into the great room toward the back of the house, and Ms. Green ran back into her bedroom and picked up her granddaughter. She took the child into the bathroom and told her to lie down in the bathtub. Ms. Green ran back to her bedroom and into the hallway where she saw a second intruder, the Defendant, running to the back door. She could not tell if Defendant had a weapon. After the two intruders left the house, Ms. Green attempted to enter the victim's room through the main door, but something was blocking it. She then entered the room through a second set of doors and found the unresponsive victim lying face down with his head up against the main door. Ms. Green attempted CPR on the victim but she could not revive him. Police and emergency personnel then arrived on the scene. Ms. Green testified that she did not know there were pistols in the house, and she was unaware of any cocaine or marijuana in residence. She said that Christopher Crockett was employed by Carolyn's Home Style Kitchen.

Christopher Crockett testified that on the night of the murder, he and the victim were in the victim's bedroom playing video games when an unfamiliar man, Benjamin Dickens, walked in with a gun. Dickens then asked, "Where's the money." Mr. Crockett told Dickens to relax and that he would get anything Dickens needed. Mr. Crockett and the victim knew that Crockett's Bryco nine millimeter semiautomatic weapon was hidden underneath a wicker stand in the victim's bedroom, but neither of them attempted to get the gun. Mr. Crockett then got up and led Mr. Dickens to a wooden "dresser box" in the livingroom where he kept money that he had received from an insurance settlement. As Mr. Crockett and Mr. Dickens were walking down the hallway, Mr. Dickens looked into another bedroom and saw Ms. Burkeen talking on her cell phone. He then threatened Ms. Burkeen with the gun and took her phone. Mr. Crockett and Mr. Dickens continued down the hallway to the livingroom. As Mr. Crockett was taking money out of the wooden box, Ms. Green opened her bedroom door, and the dog began barking and growling. This distracted Mr. Dickens from taking the money, and he began pointing the gun at the dog. In order to calm Mr. Dickens down, Mr. Crockett took the dog to the den. While he was in the den, Mr. Crockett saw Defendant, who was wearing a mask, run toward the victim's room. Mr. Crockett then heard gunshots, and as he was running to his bedroom to get a gun, he ran into Defendant in the hallway. Defendant had a gun, and he and Mr. Crockett began struggling in the hallway. Mr. Crockett took the gun from Defendant and attempted to shoot him, but the weapon jammed. Mr. Crockett then ran into his bedroom and retrieved his revolver from the closet. Mr. Crockett ran toward the back door and out onto the deck firing shots at the two intruders, who also fired at him. Mr. Crockett later learned that he shot one of them.

Mr. Crockett and Ms. Green then entered the victim's room and found him lying face down on the floor. Because the victim was very large, they were unable to roll him completely over or move him to the bed. Mr. Crockett saw his Bryco nine millimeter on the floor of the victim's bedroom and placed it back underneath the wicker stand to get it out of the way. He later showed the gun to police, and he also gave them his revolver and the gun that he took from Defendant. Mr. Crockett later identified Mr. Dickens from a photo line-up. At trial, Mr. Crockett admitted that he had a prior felony drug conviction. He also said that he knew Hershel Lillard because the two worked together at Carolyn's Homestyle Kitchen, and Hershel Lillard had been to his house a day or two before the murder.

Arenthia Burkeen, Mr. Crockett's girlfriend, testified that she was in her bedroom on the night of August 5, 2003, with her three-year-old daughter when Benjamin Dickens walked into the room with a gun and took her cell phone. Ms. Burkeen later heard gunshots, and she and her daughter hid in bed underneath the covers until she felt that it was safe. After everything was quiet, Ms. Burkeen emerged from the bedroom with her daughter and ran into the bathroom across the hall and hid in the shower. She later called 9-1-1 after the victim was found lying face down in his room. Ms. Burkeen testified that she knew about one of the guns in the house, and she said that there was no marijuana or cocaine in the residence.

Officer Carlos Anderson of the Metropolitan Nashville Police Department, East Precinct, was dispatched to the scene. He arrived and saw Ms. Green and Ms. Burkeen running out of the house screaming. Officer Anderson followed them back inside the house where he found the victim leaning against a wall. The victim was still alive but had a difficult time breathing, and there was blood near his chest. Officer Anderson then called for homicide and the identification sections. He also noticed little holes that appeared to be from gunfire and little spots of blood that led from the victim's room through the back door. Officer Anderson secured the scene, and he thought that Christopher Crockett showed him two guns. He said that Mr. Crockett also told him that there were three people that came into the house.

Detective Joe Williams, homicide division, received a call about the shooting and drove to Skyline Medical Center's emergency room where the victim had been pronounced dead. He then transported Ms. Green and the victim's aunt to the homicide office. The following morning, Detective Williams attended the victim's autopsy and collected a bullet that was taken from the victim's body.

Detective Jason Rosalina of the Armed Robbery Squad testified that on the night of August 5, 2003, he received word of a robbery at 509 Mill Station Road and that Defendant was at Baptist Hospital with a gunshot wound. He drove to the emergency room at Baptist

Hospital and spoke with Defendant who said that his cousin Hershall Lillard, and Ben Dickens drove him to the hospital in a white Ford Taurus. Detective Rosalina collected Defendant's clothing and followed a blood trail from the emergency room to the parking garage. He found the parking space where the blood trail stopped but there was no car parked in it.

Sergeant Daniel Orr of the identification section testified that he went to the murder scene and made a diagram of the floor plan. He collected various samples of blood in the house and three guns. A .357 Rossi revolver and a Bryco Jennings nine millimeter semiautomatic (serial #1539741), were found in Mr. Crockett's bedroom and another Bryco Jennings nine millimeter (serial #1463824) was found in the hallway under a wicker piece of furniture. The nine millimeter found in Mr. Crockett's bedroom was jammed, which prevented it from being fired. The gun was also loaded with .380 caliber bullets, which was unusual because they were the wrong size for the gun. Sergeant Orr testified that he collected three nine millimeter shell casings in the victim's bedroom and two .380 caliber shell casings outside of the victim's bedroom near the front of Mr. Crockett's bedroom. Officer Charles Linville of the technical investigation section testified that he assisted in collecting the three weapons. He again viewed them on August 15, 2003, in the lab. One of the nine millimeter weapons (serial # 1539741) had blood on it, and he swabbed the area. There was nothing on the other gun.

Detective Robert Anderson of the homicide unit testified that he was dispatched to the murder scene and spoke with Christopher Crockett and other officers. He also viewed evidence in the residence. Later that night, he interviewed Mr. Crockett and Ms. Burkeen at the Criminal Justice Center. Detective Anderson agreed that according to Mr. Crockett's version of events, the victim would have been the one who shot Defendant. He also learned that Defendant had been checked into the emergency room at Baptist Hospital with four gunshot wounds, and he spoke to Defendant twice at the hospital. Detective Anderson eventually filed criminal charges against Defendant and obtained a saliva sample from Defendant.

Dr. Stacy Turner testified that Dr. John Gerber, who was deceased at the time of trial, performed an autopsy on the victim. According to the report, the victim died from a gunshot wound to his chest. There was no exit wound, and the manner of death was homicide. There were no drugs or alcohol found in the victim. Dr. Turner testified that the shot was fired from an indeterminate range, meaning that it was at a probable distance of farther "than three feet or else something was between the barrel of the gun and the skin." There was nothing in the report about gunshot residue.

Special Agent Charles Hardy, a forensic DNA analyst with the Tennessee Bureau of Investigation (TBI), testified that he received six swabs from the Metropolitan Nashville Police Department and tested them for the presence of blood. On each swab the test was positive, and Agent Hardy then generated a DNA profile which he compared with Defendant's saliva sample. The saliva sample matched the DNA profile of blood collected from the door frame between the bedrooms, the living room floor and the nine millimeter (serial #1539741) found in Mr. Crockett's bedroom.

Special Agent Steve Scott of the TBI, Firearms Identification Unit, testified that he examined the two Bryco nine millimeter pistols and a Rossi .357 Magnum revolver as well as one .380 caliber bullet recovered from the victim, three nine millimeter cartridge casings and four .380 auto cartridge cases. Agent Scott tested the three guns and found that they were in normal operating condition. He also compared the bullet recovered from the victim with the three guns and found that it was fired through the barrel of the nine millimeter weapon (serial #1539741) found in Mr. Crockett's bedroom. The four .380 cartridge casings were fired from the same gun. Agent Scott testified that .380 ammunition can be fired from a nine millimeter weapon; however, it "is more likely to cause a jam or a misfeed or a failure to extract." He determined that the three nine millimeter shell casings were fired from the nine millimeter handgun (serial #1463824) found under the wicker stand near the victim's bedroom.

At the close of the State's proof and prior to Defendant's testimony, Defense counsel read the following two stipulations of fact into the record:

Stipulation Number 1: The undersigned parties hereby stipulate the following facts:

One, in 2003, John Kelton was a member of the Metropolitan Police Department in Nashville, Tennessee.

Two, he was one of the officers dispatched to the residence of Justin Green on the night Justin Green was shot and killed.

Three, he took possession of a plastic trash can liner that had been found in a garbage can across the street from the site of the shooting. A neighbor had reported seeing someone come from the house and place the bag in the trash can.

Four, the bag contained approximately one and one half pounds of marijuana, approximately 60 grams of cocaine and a set of digital scales.

Five, Officer Kelton confronted Christopher Crockett with the drugs and Chris Crockett initially denied any knowledge of the drugs.

Six, while transporting Christopher Crockett downtown for an interview Officer Kelton was able to convince Chris Crockett that he needed to tell the truth about the drugs in order to help solve who had killed his brother.

Seven, Chris Crockett finally admitted that the drugs and scales belonged to him.

*    *    *

Stipulation Number two: The undersigned parties hereby stipulate to the following facts:

Warren Fleek, a member of the Metropolitan Police Department, was unavailable to testify this week. If called as a witness would testify, quote: That he assisted Sergeant Danny Orr in gathering evidence at the residence of Justin Green on the night of the shooting.

In the course of gathering evidence he retrieved a nine millimeter projectile from a wicker shelf just outside the bathroom in the hallway. That projectile was later determined to have been fired from the nine millimeter Bryco gun recovered in Chris Crockett's bedroom.

From the position of the bullet strike, the direction of the bullet was fired from the front of the house toward the back of the house, close quotes.

Defendant testified that on August 5, 2003, Benjamin Dickens picked him up, and they rode around visiting friends and drinking. Later on, they decided to celebrate Defendant's birthday a couple of days early by purchasing marijuana and getting high. Defendant testified that his cousin Hershall Lillard and Arnold Foster, another relative, eventually joined them. Defendant did not have any money, and he said that Mr. Dickens, Mr. Lillard, and Mr. Foster all contributed money for the purchase. Defendant testified that Hershel Lillard, a drug dealer, knew Mr. Crockett and that they could purchase some marijuana from him. The four men then drove to 509 Mill Station Road, and Defendant and Mr. Dickens got out and knocked on the front door but no one answered. Hershel Lillard remained in the car with Mr. Foster because he owed Mr. Crockett some money. Defendant testified that he and Mr. Dickens then walked to the back of the house and knocked on the back door. After no one answered, Mr. Dickens yelled that the door was open, and he was

going in. Defendant claimed that he remained outside, and two to three minutes later heard arguing, screaming, and dogs barking inside the house. After nearly twenty seconds, Defendant, who had been drinking, entered the house.

Defendant testified that the house was dark inside, and he heard loud noises, someone screaming, and someone saying "please don't do this and a lot of commotion going on." He said that he was walking down the hallway toward a scream when he heard gunfire and realized that he had been shot. Defendant testified that a larger man with a gun then ran up to him, and they began wrestling while the gun continued to fire. He said that the gunshots eventually stopped, the man let him go, and he ran back down the hallway to the back door. Defendant testified that he was shot a total of four times, and one of the shots broke his right leg causing him to fall repeatedly as he ran from the house. He said that Dickens appeared and was "pulling" him with one arm and shooting back at someone on the back porch with his other arm. Defendant and Dickens made their way to the car where Hershall Lillard and Arnold Foster were waiting. They drove to the hospital and dropped Defendant off. He spoke to Detective Anderson the following morning. Defendant claimed that he did not enter the house with the intention of robbing anyone and that he only wanted to purchase marijuana for his birthday. He also said that he did not fire any shots on the night of the murder, and he never had a weapon. Defendant admitted that he has sold and used illegal drugs, and he has a couple of felony drug convictions.

## II. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his felony murder conviction. We disagree. When a defendant challenges the sufficiency of the evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a

combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A person commits first degree felony murder by killing another in the perpetration or attempt to perpetrate several enumerated felonies, including, as relevant here, robbery. T.C.A. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the victim in fear." T.C.A. § 39-13-401(a).

Viewing the evidence in a light most favorable to the State, Benjamin Dickens and Defendant entered Ms. Green's house armed with deadly weapons, and Defendant was wearing a mask. Mr. Dickens went to the victim's bedroom where he and Mr. Crockett were playing video games and demanded money from Mr. Crockett. Mr. Crockett led Mr. Dickens to a wooden "dresser box" in the livingroom where he kept money from an insurance settlement. As Mr. Crockett was taking money out of the box, Ms. Green opened her bedroom door, and Mr. Dickens threatened her and her dog with the gun. Mr. Crockett and Ms. Green then heard multiple gunshots, and Defendant was seen running from the victim's bedroom. As Mr. Crockett started to his bedroom to retrieve his gun, he ran into Defendant in the hallway. The two began struggling, and Mr. Crockett testified that he took a Bryco Jennings nine millimeter gun (serial # 1539741) from Defendant and attempted to shoot him; however, the weapon jammed because it had been loaded with .380 caliber bullets. Mr. Crockett then entered his bedroom, retrieved a revolver from the closet, and ran out onto the deck firing at Defendant and Dickens, who also fired back. The fifteen-year-old victim was found unresponsive in his bedroom and was later pronounced dead at Skyline Medical Center. The autopsy revealed that the victim died from a gunshot wound to his chest. Police later found Defendant at the emergency room of Baptist Hospital with four gunshot wounds. It was determined that the .380 caliber bullet recovered from the victim was fired from Defendant's gun, and blood on the weapon matched that of Defendant. Defendant's blood was also found on the door frame between the victim's and Mr. Crockett's bedrooms and on the living room floor.

Although there were various inconsistencies between Mr. Crockett's trial testimony, his testimony at earlier hearings and the testimony of other witnesses, the jury resolved those inconsistencies in favor of the State. As previously stated, questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. *Bland*, 958 S.W.2d at 659. The evidence was sufficient to support the conviction for first degree felony murder. Defendant is not entitled to relief on this issue.

### III. Failure to Instruct the Jury on Tennessee Pattern Jury Instruction 42.07

Defendant next argues that the trial court erred in failing to provide an instruction to the jury on Tennessee Pattern Jury Instruction (T.P.I.- CRIM.) 42.07 regarding his prior felony convictions. He essentially contends that his right to a fair trial was affected because the jury convicted him based on his "bad character as a convicted drug dealer/user or his apparent propensity or disposition to commit a crime . . ." We disagree.

Generally, when a defendant complains of an instruction being omitted, he or she must make a special request that the instruction be given or object to its omission. *See* Tenn. R.Crim.P. 30(a); *State v. Cravens*, 764 S.W.2d 754, 757-58 (Tenn. 1989); *State v. Haynes*, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986); *Bolton v. State*, 591 S.W.2d 446, 448 (Tenn. Crim. App. 1979). Failure to call the alleged omission to the trial judge's attention at trial results in a waiver of the issue. *State v. Robinson*, 146 S.W.3d 469, 509 (Tenn. 2004). Defendant did raise the issue in his motion for new trial; however, the Supreme Court has held: "In contrast to an erroneous instruction, defense counsel cannot sit on an objection to an omitted charge and allege it as a ground in the motion for new trial." *Id*. at 509. In this case, Defendant failed to request an instruction on T.P.I.- CRIM. 42.07 at trial, and he did not object to the omission of the instruction. The only special request for an instruction that Defendant made was for the indicted offense of first-degree felony murder taken verbatim from the case of *State v. Severs*, 759 S.W.2d 935 (Tenn. Crim. App. 1988). The trial court denied Defendant's request, and Defendant does not challenge this denial. Because Defendant failed to make a special request for an instruction on T.P.I. - CRIM. 42.07 or object to its omission at trial, this issue is waived. *See also* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Even if this issue was not waived, Defendant would not be entitled to relief. T.P.I. - CRIM 42.07 provides:

> If from the evidence presented you find that the defendant has been convicted of [a] prior [crime][crimes], you can consider such only for the purpose of its effect, if any, on [his][her] credibility as a witness. It cannot be considered by you as evidence of [his][her] guilt of the offense for which [he][she] is not on trial.

As noted by the trial court in its order denying Defendant's motion for new trial, Defendant mentioned his prior drug-related convictions on direct examination. The court stated: "Apparently, this strategic move was implemented as sort of a preemptive strike, or a technique intended to essentially lessen the detrimental effect that such criminal records

could possibly have on a jury if addressed initially by the prosecution." In his brief, Defendant states the following:

> The Trial Court was correct in that the decision by Appellant's counsel to bring before the jury the past drug convictions of the Appellant was a strategic decision made in order to minimize the effect of the convictions while bolstering the Appellant's contention that he was there to buy drugs like he had bought and sold drugs in the past. However, such decision was made with the assumption that the Trial Court would instruct the jury as to the proper way to handle the information relative to the prior drug convictions. Otherwise, counsel for the Appellant would have had a jury out hearing in order to try and block the introduction of any prior convictions.

In effect, Defendant wanted to set forth to the jury propensity evidence. That is, because he had bought/sold illegal drugs in the past, he was at the victim's house to buy drugs and not to rob or kill anyone. The instruction that he now says the trial court should have charged would have been contrary to the reason that he wanted the evidence put before the jury. This issue is without merit.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE